UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

AYMAN ABDEL-KARIM,

                           Plaintiff,              12 Cv. 5614 (JGK)

            - against -                            OPINION AND ORDER

EGYPTAIR AIRLINES, ET AL.,

                           Defendants.
_____

JOHN G. KOELTL, District Judge:

        The plaintiff, Ayman Abdel-Karim, flew from New York City
to Cairo with several weapon-like items in his checked baggage.
When he arrived in Cairo, he was detained, arrested, and charged
for bringing weapons into Egypt.  The charges were eventually
dismissed.  The plaintiff now brings suit against EgyptAir
Airlines ("EgyptAir"), the airline in which he flew to Egypt,
and EgyptAir Holding Company ("EHC"), a related company,
claiming that their negligence, among other things, led to his
arrest and detention in Egypt.

        The plaintiff brought this action in New York state court
and the defendants properly removed it to this Court under
§ 1441(a) on the basis of diversity of citizenship and § 1441(d)
on the basis that EHC is an instrumentality of a foreign state.
The Complaint alleges thirteen different state law claims,
including breach of contract, negligence, fraud, and
discrimination claims.  The Complaint also names the Arab

Republic of Egypt as a defendant, but the Republic of Egypt has
never appeared in this action.[1]  EHC and EgyptAir now move for
summary judgment dismissing all claims against them pursuant to
Rule 56 of the Federal Rules of Civil Procedure.  EHC argues
that this Court does not have personal jurisdiction over it, and
both defendants argue that the plaintiff's claims are preempted
by the Airline Deregulation Act ("ADA"), 49 U.S.C.
§ 41713(b)(1), and, in any event, are all without merit.

 The Court has subject matter jurisdiction over this case
pursuant to 28 U.S.C. §§ 1330(a) and 1332.  For the reasons that
follow, the defendants' motion for summary judgment is **granted.**

I.

 The standard for granting summary judgment is well
established.  "The Court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477
U.S. 317, 322–23 (1986); Gallo v. Prudential Residential Servs.,
LP, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's
task at the summary judgment motion stage of the litigation is

---

[1]   The plaintiff concedes that there are no independent viable
claims against the Arab Republic of Egypt apart from what he has
alleged against EHC and EgyptAir.  Therefore, because the Court is
dismissing the claims against EHC and EgyptAir, the claims against the
Arab Republic of Egypt are dismissed as well.

carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the non-moving party must produce

3

evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases).

## II.

The following facts are taken from the record and are undisputed, unless otherwise noted.

### A.

The defendant EgyptAir operates commercial flights between JFK International Airport in New York ("JFK") and Cairo International Airport in Cairo, Egypt. Carlsen Decl. Ex. F (El Morsy Decl.) ¶ 2. The flight between JFK and Cairo is the only flight that EgyptAir operates in the United States. Id. EgyptAir is owned by the defendant EHC. Carlsen Decl. Ex. L (El Mahmoudy Decl.) ¶ 6. Both EHC and EgyptAir are corporations organized under Egyptian law, with their principal places of business in Cairo, Egypt. Id. ¶¶ 7-8. EHC is wholly owned by the Arab Republic of Egypt. Id. ¶ 6.

The parties dispute the extent of EHC's contacts with New York. According to EHC, it is merely a holding company for its subsidiaries, is not involved in EgyptAir's operations, and has not carried on any business activities in New York or anywhere

4

in the United States.  El Mahmoudy Decl. ¶¶ 8-10.  EHC
represents that it does not have any employees present in New
York, except when EHC employees are temporarily seconded to
EgyptAir.  Id. ¶¶ 10-11.  During those times, EgyptAir decides
where it will send the EHC employees, controls their duties, and
pays the employees a salary.  Id. ¶ 11.

The plaintiff contends that EgyptAir and EHC operate as a
single entity.  In support of this argument, the plaintiff cites
two copies of EgyptAir's permit renewals issued by the United
States Department of Transportation.  See Bierman Decl. ¶¶ 44-
45, Exs. RR, SS.  In those renewals, EgyptAir is listed as
"EgyptAir," which the plaintiff contends could refer to either
EgyptAir Airlines Company or EgyptAir Holding Company.

The plaintiff also claims that EHC does have contacts in
New York.  The plaintiff points to a cooperation agreement
entered into by United Airlines and EHC in 2008.  Id. Ex. H.  In
that agreement, EHC is listed as headquartered in Egypt, and the
agreement purports to "increase each Carrier's opportunities to
offer competitive and cost effective air transportation services
between points in and beyond the United States and Egypt."  Id.
The plaintiff also contends that two EHC employees—Ayman El Aydy
and Osman Ahmed—had been seconded to work for EgyptAir at JFK

and were directly involved in the events described below, which
form the basis of the plaintiff's claims.

**B.**

The plaintiff, Ayman Abdel-Karim, was born in Egypt, moved
to the United States in 1987, and has dual United States and
Egyptian citizenship.  Abdel-Karim Dep. 6.  Abdel-Karim is the
President and Chief Executive Officer of three companies with
offices in the United States and Egypt: a health care services
company, an antiques trading and Egyptian rug company, and a
food production company.  Id. at 8-13.  The food company's main
product is olive oil, produced on an olive tree farm in Egypt.
Id. at 13.

In March 2011, Abdel-Karim purchased a ticket from EgyptAir
for travel from JFK to Cairo.  Defs. 56.1 Stmt. ¶ 1.  He was
flying to Egypt to file a complaint with the Egyptian government
and to check on his various businesses, including his olive tree
farm.  Id. ¶¶ 3-4.  Abdel-Karim intended to take several weapon-
like items to Egypt for the maintenance and protection of his
farm and he sought to carry them in his checked baggage with
EgyptAir.  The items included: four "sound revolvers," which did
not fire any projectiles but only made loud noise to scare away
attackers; one pellet gun with pellets; two large machete-like
instruments (termed "swords" in the Complaint) and two smaller

knife-like instruments to be used for clearing brush and fending off wild animals; binoculars; and an archery bow with arrows, which was a gift for a relative.  Id. ¶¶ 5-9; Pl. 56.1 Resp. ¶¶ 5-9; Abdel-Karim Dep. 25-27.  The parties refer to these items as the "special items."

Prior to the flight, Abdel-Karim instructed his New York-based employees to contact EgyptAir and the Transportation and Security Administration ("TSA") to determine what procedures he had to comply with in order to bring the special items in his checked luggage.  Defs. 56.1 Stmt. ¶ 12; Pl. 56.1 Resp. ¶ 12. One employee, Pamela Cooper-Czarnecki, called EgyptAir, and EgyptAir advised her to contact the TSA.  Carlsen Decl. Ex. G (Cooper-Czarnecki Decl.) ¶ 3.  The plaintiff contends that EgyptAir advised that compliance with TSA rules is all that was required, and points to separate affidavits by Cooper-Czarnecki. See Bierman Decl. Exs. EE, FF. However, those affidavits also say that Cooper-Czarnecki was only advised to contact the TSA, and nothing else.  At his deposition, the plaintiff also testified that EgyptAir personnel did not provide his assistant with any information on Egyptian law or as to any requirements for bringing the special items into Egypt.  Abdel-Karim Dep. 153-54.

Another assistant, Lisa Algammaz, contacted the TSA.  Defs. 56.1 Stmt. ¶ 16.  Algammaz relayed the pertinent information from the TSA to Abdel-Karim in a memorandum dated March 21, 2011.  The memorandum only mentions "firearms" and the archery equipment.  Carlsen Decl. Ex. I.  The memorandum states, among other things, that firearms should be unloaded, enclosed in a single container, and that the airline would place a "Declaration Tag" on the container before it is further inspected by the TSA.  Id.  The memorandum also stated that all sharp parts of the archery equipment should be securely wrapped. Id.

EgyptAir's Conditions of Carriage were incorporated into the contract between Abdel-Karim and EgyptAir.  Defs. 56.1 Stmt. ¶ 10; Pl. 56.1 Resp. ¶ 10.  The Conditions of Carriage has several provisions that relate to passenger baggage.  Article 7.1, titled "Right to Refuse Carriage," provides that EgyptAir "may refuse" to carry the passenger or his or her baggage, and lists several possible reasons, including if "[s]uch action is necessary in order to comply with any applicable government laws, regulations, or orders."  Carlsen Decl. Ex. F ("Conditions of Carriage").

Article 8.3 is titled "Items Unacceptable as Baggage." Article 8.3.1.2 provides, "You must not include in your Baggage

. . . [i]tems the carriage of which is prohibited by the applicable laws, regulation or orders of any state to be flown from, or to." Id. Under Article 8.3.2, passengers must present "weapons of any kind" to EgyptAir for inspection. Id. Firearms and ammunition may be accepted as checked baggage for hunting and sporting purposes only. Id. at 8.3.3. "Weapons such as antique firearms, swords, knives and similar items may be accepted as Checked Baggage, at [EgyptAir's] discretion." Id. at 8.3.4. The Conditions of Carriage also provide that the passenger is "responsible . . . for complying with all laws, regulations, orders, demands and travel requirements of countries to be flown from, into or through which" the passenger travels. Id. at 13.1.1.

### C.

On March 27, 2011, the plaintiff arrived at JFK and informed EgyptAir's Assistant Station Manager, Amr El Morsy, that his bag contained the special items. Defs. 56.1 Stmt. ¶ 36; Pl. 56.1 Resp. ¶ 36. According to Abdel-Karim, TSA agents at the airport told him that EgyptAir should have a form for him to fill out for the items. Abdel-Karim Dep. 36. Abdel-Karim claims that he went to El Morsy and asked for such a form, and El Morsy said that he could not find one. Id. According to El Morsy, however, EgyptAir does not provide passengers with any

type of "declaration form" for items they are carrying in their checked luggage.  El Morsy Decl. ¶ 11.  The plaintiff conceded at his deposition that neither El Morsy nor any EgyptAir employee at JFK provided him with any information on Egyptian law or on whether any permits or licenses were required for the weapons in Egypt.  Abdel-Karim Dep. 155-57.  In any event, El Morsy notified the Port Authority Police and the TSA to arrange for an inspection of Abdel-Karim's luggage.  El Morsy Decl. ¶ 2; Abdel-Karim Dep. 36-37.

Osman Ahmed, a security officer employed by EHC, had been assigned to work for EgyptAir at the check-in counter at JFK in 2011.  Osman Dep. 35, 102.  Ahmed accompanied Abdel-Karim and his luggage to the TSA so that the TSA could inspect the luggage.  Id. at 145.  The police and TSA inspected the items, and Abdel-Karim boarded the flight.  Abdel-Karim Dep. 37-39. After the flight departed, El Morsy sent a message to the EgyptAir station in Cairo, notifying them that the bag containing the special items was on the flight.  El Morsy Decl. ¶ 6.  On the day of the flight, Ayman El Aydy, who is usually employed by EHC, was seconded to work in JFK as the chief EgyptAir security officer.  Carlsen Decl. Ex. K (El Aydy Decl.) ¶ 2; El Aydy Dep. 7, 31.  El Aydy called EgyptAir's Cairo security office and informed them that there were guns in

10

Abdel-Karim's checked baggage.  El Aydy Decl. ¶ 6.  El Aydy
claims that it is EgyptAir policy, in accordance with Egyptian
law, to inform the destination of the presence of any type of
gun, so that they may transport it to customs officials for
inspection upon landing.  Id. ¶¶ 7-8.

Apparently, the communications from New York reached the
EgyptAir Operations Office instead of the EgyptAir security
team.  See Bierman Decl. Exs. R, T.  According to Maged Ahmed,
an EgyptAir security officer in charge of the "New York group"
in Cairo, the Operations Office then mistakenly called airport
security, instead of the EgyptAir security team.  Maged Dep. 11-
13, 66-67; Bierman Decl. Ex. R.  Nevertheless, EgyptAir security
officers discovered that Abdel-Karim's special items were in
checked baggage as soon as the plane landed.  Maged Dep. 27-28.

The flight arrived in Cairo the following morning.  Maged
Dep. 24-25; Bierman Decl. Ex. R.  EgyptAir security personnel
removed Abdel-Karim's bag containing the special items from the
airport baggage area, and then sought out Abdel-Karim when he
got off the plane.  Defs. 56.1 Stmt. ¶ 51; Pl. 56.1 Resp. ¶ 54.
The EgyptAir personnel brought Abdel-Karim to the customs area,
where Egyptian customs officials searched all of his bags.
Defs. 56.1 Stmt. ¶ 52; Pl. 56.1 Resp. ¶ 52; Abdel-Karim Dep. 48-
51; Maged Dep. 36.  After the customs officials searched all of

11

Abdel-Karim's baggage, they informed him that Egyptian law prohibited his carrying the special items into Egypt.  Defs. 56.1 Stmt. ¶ 57; Pl. 56.1 Resp. ¶ 57; Abdel-Karim Dep. 54-56. The Egyptian police arrested Abdel-Karim and took him to a police station within the airport.  Defs. 56.1 Stmt. ¶ 58; Pl. 56.1 Resp. ¶ 58.

Maged Ahmed prepared a report of the events for EgyptAir in Cairo.  See Bierman Decl. Ex. R.  Ahmed had overseen the transportation of Abdel-Karim's checked luggage to the Egyptian customs officials, but then remained out of the inspection area while they inspected his bags.  Maged Dep. 36, 41-42, 51.  Ahmed observed Abdel-Karim and the customs officials begin to argue loudly.  Id. at 43.  He then instructed an EgyptAir investigation officer to go over to the customs area to find out what was going on.  Id. at 44-45, 49-52.  Ahmed wrote a report about the incident based on what he observed that day, and his conversations with his staff and with Abdel-Karim.  Id. at 45, 48, 55.

Ahmed originally wrote the report in Arabic, and the defendants offered what they claim is an unofficial, informal English translation.  The report is addressed to the "Head of the Airline's Security Department."  Bierman Decl. Ex. R.  In the report, Ahmed first recounts his action in instructing

12

another security officer to "follow" Abdel-Karim's luggage when the plane landed in Cairo.  Id.  He then recounts what happened to Abdel-Karim in New York, and the English translation states that in New York, "unfortunately no procedures were taken in regards to loading the luggage containing arms or ammunition in regards to (form of carrying weapons) and the luggage form of suitcases (blue card)."  Id.  However, in his deposition, Ahmed made clear that these conclusions were only based on what Abdel-Karim told him, and that Ahmed did not verify the information with anyone in New York.  Maged Dep. 55, 60-61.

The report also recounts the purported errors in communication between New York and Cairo, and explains how the Cairo security office nevertheless found out about the special items in the luggage.  Bierman Decl. Ex. R.  Ahmed concludes: "I ask you to kindly address New York Station to necessarily follow the proper procedures to accept luggage containing (arms and ammunition) and inform us if they exist onboard . . ."  Id.  The report was forwarded to higher management levels in EgyptAir's security department.  Id. Ex. T.  Based on the report, the "General Manager of the Airlines Security" concluded that the New York security group "had not followed necessary procedures" by dealing "with the bag similar to any regular bag although

they were aware that it contained a weapon and ammunition." Id. Ex. U.

### D.

After being taken to the airport police station on the day the flight landed, Abdel-Karim spent several hours being shuttled between different police stations and then a courthouse, where he waited for several hours before being released late at night. Abdel-Karim Dep. 69-70. After releasing him that night, Egyptian authorities ordered him to remain in Egypt to be tried for his alleged crimes. Id. at 70-71. Abdel-Karim claims that following his arrest, Egyptian newspapers reported "that an American had been arrested smuggling weapons into Egypt." Abdel-Karim Decl. ¶ 13.

Egyptian customs officials prepared a report regarding their search of the plaintiff's baggage. Defs. 56.1 Stmt. ¶ 61; Pl. 56.1 Resp. ¶ 61. The plaintiff represents that this report constitutes the criminal charges against him. Bierman Decl. ¶ 10, Ex. J. An English translation of the report offered by the plaintiff lists all of the special items found in the plaintiff's baggage. Carlsen Decl. Ex. D. The report states that the sound revolvers, pellet gun, and ammunition all require "permission from the public security authority," and that the smaller knives, which it termed "daggers," and larger machete-

like tools, which it termed "swards [sic]," were "prohibited according to weapons and ammunitions law No. 394/54 and amendments."  Id.  The report concluded that the "Passenger," Abdel-Karim, "should be sent to the criminal investigation," and that the seized special items would remain with customs until Abdel-Karim had received the required permissions.  Id.

On or about May 19, 2011, an Egyptian court held a trial for the charges against Abdel-Karim.  Carlsen Decl. Ex. E (Egyptian Court Judgment).  Ultimately, Abdel-Karim was only tried for bringing the "sword"—or larger gardening tool—to the country, because the prosecutor determined that the other items did not require permits.  Id.; Abdel-Karim Dep. 147-49.  The court found Abdel-Karim innocent of all charges.  Carlsen Decl. Ex. E.  The only evidence describing the court's reasons is a one-page judgment, originally written in Arabic and translated somewhat cryptically into English.  The judgment appears to conclude that Abdel-Karim was arrested illegally, in part because "the officer did not show how he seized weapons with the accused person," and because the arrest "was prior to" the seizure of the "weapon."  Id.  Abdel-Karim testified in his deposition that the court found that he was not required to have a license for the "sword" because it was for his farm.  Abdel-Karim Dep. 149-50.

15

After the trial, the Egyptian government advised the plaintiff and his lawyer that all of his special items would be returned to him if he paid an administrative fee.  Defs. 56.1 Stmt. ¶ 71; Pl. 56.1 Resp. ¶ 71.  Abdel-Karim refused to pay the fee because it was more expensive than repurchasing all of the special items separately.  Defs. 56.1 Stmt. ¶ 72; Pl. 56.1 Resp. ¶ 72; Abdel-Karim Dep. 81.

**E.**

The plaintiff concedes that he was not in violation of Egyptian law when he brought the special items into Egypt.  However, the plaintiff faults EgyptAir for purportedly failing to follow its own procedures for dealing with the special items, a failure which purportedly caused Abdel-Karim's arrest by the Egyptian police.  In describing procedures that EgyptAir failed to follow, the plaintiff points to the Conditions of Carriage and various internal EgyptAir manuals, such as a "Traffic Manual," Bierman Decl. Ex. D, a "Security Program Manual," Bierman Decl. Ex. C, a "Baggage Handling Manual," Bierman Decl. Ex. E, and a "Dangerous Goods and Weapons Manual," Bierman Decl. Ex. F.

The plaintiff also claims that several EgyptAir employees were not sufficiently trained in dealing with the transporting of weapons.  Pl. Supp. 56.1 Stmt. ¶¶ 138-42, 196-97.   He

16

contends that when he arrived at JFK Airport, EgyptAir should have given him a declaration form for his special items.  Abdel-Karim Dep. 36.   According to the plaintiff, he was told by TSA agents at JFK Airport and a customs officer at Cairo Airport that EgyptAir should have given him a form.  Id. at 36, 52-53. The plaintiff also points to Maged's report mentioning that "no procedures were taken in regards to" certain forms for Abdel-Karim's luggage.  Bierman Decl. Ex. R.

It is not clear whether such a form exists for the special items.  The plaintiff has submitted in evidence certain EgyptAir declaration forms titled "Declaration of Surrender of Munitions of War" and "Declaration of Surrender of Firearms."  Bierman Decl. Ex. C.  However, it is clear that the form pertaining to firearms was not in use at JFK Airport at the time of Abdel-Karim's March 2011 flight.  The firearms form indicated by the plaintiff is dated April 2012, and the 2011 manual only included the "Munitions of War" form.  See Defs. Reply Br. Ex. A; Bierman Decl. Ex. C, at EA 2009.  Moreover, El Morsy, the Assistant Station Manager at JFK at the time of Abdel-Karim's flight, testified in his deposition that all of the manuals were not used in the United States because EgyptAir only follows TSA regulations in the United States.  El Morsy Dep. 175-79, 184.

17

Alternatively, the plaintiff asserts that EgyptAir should have refused to carry the special items because they are prohibited under EgyptAir's own rules.  Several rules indicated by Abdel-Karim, such as those under Section 7.1 of the Conditions of Carriage, provide instances where EgyptAir "may refuse" to carry items, and others place the responsibility on the passenger not to bring any prohibited items to the destination country.  See Carlsen Decl. Ex. F, at 8.3.3.  The plaintiff also points to the EgyptAir Traffic Manual, which states that "[k]nives, daggers, [and] swords" are "absolutely forbidden for carriage as checked or unchecked baggage both by passenger and crew, since these articles are dangerous for flight safety."  Bierman Decl. Ex. D, at 2.2.9.  However, the Conditions of Carriage provide that "[w]eapons such as antique firearms, swords, knives and similar items may be accepted as Checked Baggage, at our discretion."  Conditions of Carriage, at 8.3.4.  The Conditions of Carriage also state that they "shall prevail" "in the event of inconsistency" between the Conditions and other EgyptAir regulations.  Id. at 2.5.

**F.**

In March 2012, the plaintiff brought this action in New York State Supreme Court, New York County.  He alleges thirteen state law claims against EgyptAir, EHC, and the Arab Republic of

18

Egypt.  The plaintiff alleges the following eleven counts against all three defendants: (1) breach of contract, (2) fraud, (3) misrepresentation, (4) intentional infliction of emotional distress ("IIED"), (5) false imprisonment, (6) negligence, (7) gross negligence, (8) negligent infliction of emotional distress ("NIED"), (9) discrimination on the basis of nationality under New York City Human Rights Law, Administrative Code § 8-107, (10) discrimination on the basis of nationality under New York State Civil Rights Law, § 40-c, and (11) prima facie tort.  The twelfth count alleges tortious interference with contractual relations against only the Arab Republic of Egypt, and the thirteenth count alleges breach of fiduciary duty against only EgyptAir and EHC.

In July 2012, the defendants EgyptAir and EHC removed the case to this Court.  In October 2012, the Court denied the plaintiff's motion to remand the case to state court, holding that because EHC is wholly owned by the Republic of Egypt, it is a "foreign state" as defined in 28 U.S.C. § 1603.  Thus, EHC had the right to remove the case to federal court pursuant to 28 U.S.C. § 1441(d).  See Abdel-Karim v. EgyptAir Holding Co., No. 12cv5614, 2012 WL 5210082, at *1 (S.D.N.Y. Oct. 22, 2012).  Thereafter, the parties conducted discovery, which they completed in December 2014.

19

On January 12, 2015, the defendants filed the present motion for summary judgment seeking to dismiss all of the claims against them pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Following the defendants' motion, the plaintiff withdrew his claims for fraud, discrimination, and prima facie tort.  The plaintiff opposes the defendants' motion in all other respects.

### III.

The defendant EHC argues that it does not have sufficient contacts with the State of New York for this Court to exercise personal jurisdiction over it.  When the Court denied the plaintiff's motion to remand to state court, the Court found that EHC is a "foreign state" as defined in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603, and that the case was therefore properly removed under 28 U.S.C. § 1441(d).  Abdel-Karim, 2012 WL 5210082, at *1.  Accordingly, the Court has subject matter jurisdiction over the claims against EHC pursuant to 28 U.S.C. § 1330(b), and must follow the rules specified by that statute and the FSIA for determining whether there is personal jurisdiction over EHC, a foreign state.[2]

---

[2]    The parties initially briefed the issue of personal jurisdiction only on the basis of diversity jurisdiction and thus looked to the New York rules for personal jurisdiction under the New York CPLR.  Prior

Under 28 U.S.C. § 1330(b), personal jurisdiction over foreign states "shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." "Therefore, the FSIA 'makes the statutory aspect of personal jurisdiction simple: subject matter jurisdiction plus service of process equals personal jurisdiction.'" Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 579 (2d Cir. 1993), as amended (May 25, 1993) (quoting Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria, 647 F.2d 300, 308 (2d Cir. 1981)).

District courts have subject matter jurisdiction over each claim against a foreign state for which one of the exceptions under §§ 1605-07 of the FSIA is met.  28 U.S.C. § 1330(a).  The plaintiff argues that one of three possible exceptions are applicable in this case: 1605(a)(1), which allows for jurisdiction over a foreign state when it has waived immunity, either explicitly or by implication; 1605(a)(2), which applies when the cause of action is based upon the foreign state's commercial activity in the United States; and 1605(a)(5), which

to oral argument, the Court allowed the parties to submit additional arguments as to whether there is personal jurisdiction over EHC under the FSIA.

applies to personal injury torts in the United States committed by the foreign state's employees.

As an initial matter, it is plain that neither the waiver exception nor the personal injury exception are applicable to this case.  The plaintiff contends that EHC waived immunity in order to operate an airline in the United States, but this argument assumes that EgyptAir and EHC are the same entity. EgyptAir is a separately created subsidiary of EHC, and "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status" under the FSIA.  First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec"), 462 U.S. 611, 627 (1983).  The plaintiff has not submitted any evidence that shows that Egypt Air and EHC are the same entity, let alone sufficient facts to rebut the Bancec presumption that EgyptAir and EHC are separate entities.  EHC invoked immunity in its Answer to the Complaint in this action, and the plaintiff has not shown that EHC ever waived that immunity.  The "personal injury" exception is also not applicable because even assuming that the plaintiff incurred any "injury" for purposes of that subsection, that injury "did not occur in the United States." Bisson v. The United Nations, No. 06cv6352, 2007 WL 2154181, at *8 (S.D.N.Y. July 27, 2007), report and recommendation adopted

22

sub nom. <u>Bisson v. United Nations</u>, No. 06cv6352, 2008 WL 375094

(S.D.N.Y. Feb. 11, 2008).

The applicability of the commercial activity exception in

this case merits a slightly longer discussion.  Section

1605(a)(2) allows for jurisdiction over a foreign state:

> [I]n which the action is based upon [1] a commercial
> activity carried on in the United States by the foreign
> state; or upon [2] an act performed in the United States in
> connection with a commercial activity of the foreign state
> elsewhere; or [3] upon an act outside the territory of the
> United States in connection with a commercial activity of
> the foreign state elsewhere and that act causes a direct
> effect in the United States.

The FSIA defines "commercial activity" as "a regular course of

commercial conduct or a particular commercial transaction or

act."  <u>Id.</u> § 1603(d).

The plaintiff points to the following facts to show EHC's

connection to the United States: EHC has entered into a contract

with United Airlines; EHC's subsidiary, EgyptAir, operates a

commercial airline in the Unites States; and at least two EHC

employees were seconded to work for EgyptAir in the United

States during the events at issue.  All of these actions are

plainly "commercial" as the Supreme Court has interpreted it

within § 1603 because EHC is acting "in the manner of a private

player within" the market.  <u>Republic of Arg. v. Weltover, Inc.</u>,

504 U.S. 607, 614 (1992).  However, they suffer from other fatal

defects.

The plaintiff's cause of action is not related to EHC's contract with United Airlines, and thus is plainly not "based upon" it.  See Saudi Arabia v. Nelson, 507 U.S. 349, 357 (1993) ("In denoting conduct that forms the 'basis,' or 'foundation,' for a claim, ['based upon'] is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." (internal citations omitted)).  And EgyptAir's presence in the United States as a subsidiary of EHC does not suffice to show "commercial activity" by *EHC*.  As explained with respect to the plaintiff's waiver arguments, the plaintiff has not shown that EHC and EgyptAir operate as a single entity.  Accordingly, the actions of EHC's subsidiary are not a basis for invoking the commercial activity exception.  See Arch Trading Corp. v. Republic of Ecuador, No. 13cv4445, 2015 WL 3443906, at *4 (S.D.N.Y. May 28, 2015) (rejecting commercial activity exception claim based on actions of subsidiaries); Freund v. Republic of Fr., 592 F. Supp. 2d 540, 556 (S.D.N.Y. 2008) (same), aff'd sub nom. Freund v. Societe Nationale des Chemins de fer Francais, 391 F. App'x 939 (2d Cir. 2010).

Therefore, the plaintiff's only remaining basis for invoking the commercial activity exception is the involvement in the claims by two EHC employees, Ayman El Aydy and Osman Ahmed,

who had been seconded to work for EgyptAir at JFK.  But the plaintiff has offered no evidence to rebut the declaration testimony of EHC Vice President Ayman El Mahmoudy, which explains that when employees are seconded from EHC to EgyptAir, EgyptAir decides their responsibilities and pays their salary. El Mahmoudy Decl. ¶ 11.  Accordingly, El Aydy and Ahmed were acting as EgyptAir's employees, and their actions cannot be said to be EHC's commercial activity.  Moreover, El Aydy and Ahmed had a limited role in the underlying events.  Ahmed accompanied the plaintiff to the TSA inspection, and El Aydy called EgyptAir's security office in Cairo to inform them that the plaintiff was carrying guns.  These actions do not form the "basis" or "foundation" of the plaintiff's claim, and the plaintiff's claim is thus not "based upon" those actions. Nelson, 507 U.S. at 357.

Because none of the FSIA exceptions apply to EHC, EHC retains its immunity under the FSIA.  Accordingly, there is no subject matter jurisdiction over those claims, and EHC's motion for summary judgment dismissing all of the claims against EHC is **granted.**

The parties agree that there is diversity of citizenship between the plaintiff and EgyptAir.  Thus, the Court retains

jurisdiction over the plaintiff's claims against EgyptAir
pursuant to 28 U.S.C. § 1332.

## IV.

EgyptAir argues that all of the plaintiff's state law
claims are preempted by the express preemption provision in the
ADA.  The plaintiff alleges state common law claims of breach of
contract, breach of fiduciary duty, misrepresentation,
negligence, IIED, NIED, and false imprisonment.

Congress enacted the ADA in 1978, loosening its economic
regulation of the airline industry after determining that
"'maximum reliance on competitive market forces' would best
further 'efficiency, innovation, and low prices' as well as
'variety [and] quality . . . of air transportation.'" Morales
v. Trans World Airlines, Inc., 504 U.S. 374, 378 (1992).  "To
ensure that the States would not undo federal deregulation with
regulation of their own," the ADA included an express preemption
provision.  Id.  That provision reads, in relevant part: "[A]
State . . . may not enact or enforce a law, regulation, or other
provision having the force and effect of law related to a price,
route, or service of an air carrier . . . ."  49 U.S.C.
§ 41713(b)(1).

**A.**

In Northwest, Inc. v. Ginsberg, 134 S. Ct. 1422 (2014), the Supreme Court held that the ADA preemption provision applies to state common law claims, but does not preempt all such claims. Id. at 1429, 1433.  The Court affirmed its holding in an earlier case, American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), in which the Court held that the ADA did not preempt a breach of contract action against an airline because the claim was based on the parties' "privately ordered obligations" within the airline's frequent flyer program.  Id. at 228-29; Ginsberg, 134 S. Ct. at 1426.  In Ginsberg, however, the Court held that the ADA preempted a state law claim for breach of the implied covenant of good faith and fair dealing because the claim sought to "enlarge the contractual obligations that the parties voluntarily adopt[ed]."  134 S. Ct. at 1426.  The common law claim in Ginsberg, which also arose from a frequent flyer program, went beyond the voluntarily imposed undertakings of the parties and thus represented a "state-imposed obligation" under Minnesota law.  Id. at 1431.  The Court noted that although the breach of the implied covenant claim could not stand, the plaintiff's claim of ill treatment "might have been vindicated if he had pursued his breach-of-contract claim" on appeal after it had been dismissed by the district court.  Id. at 1433.

27

Under Ginsberg and Wolens, it is clear that breach of
contract actions based on the "privately ordered obligations" of
the parties remain enforceable under the ADA.  Ginsberg, 134 S.
Ct. at 1429 (quoting Wolens, 513 U.S. at 228-29).  The
plaintiff's claim in Count One of the Complaint appears to
incorporate both a claim for breach of contract and a claim for
breach of the implied covenant of good faith and fair dealing.
However, in arguing the merits of his claim, the plaintiff
relies mainly upon the parties' agreed-upon terms in the
Conditions of Carriage.[3]  Indeed, a simple breach of contract
claim under New York law may only be based on the intentions of
the parties.  See Register.com, Inc. v. Verio, Inc., 356 F.3d

---

[3]    In Ginsberg, the Court specifically did not preempt all claims
for the breach of the implied covenant.  134 S. Ct. at 1433.  The
Court held that such a claim "will escape pre-emption only if the law
of the relevant State permits an airline to contract around those
rules."  Id.  "Under New York law, every contract contains an implied
covenant of good faith and fair dealing."  Carvel Corp. v. Diversified
Mgmt. Grp., Inc., 930 F.2d 228, 230 (2d Cir. 1991).  Indeed, the
Supreme Court cited to New York law in referencing other states, like
Minnesota, which "preclude a party from waiving the obligations of
good faith and fair dealing."  Ginsberg, 134 S. Ct. at 1432 n.2
(citing Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc., 873 F.
Supp. 808, 815 (S.D.N.Y. 1994)).  However, the plaintiff's claim on
this case does not appear to be based on the breach of the implied
covenant.  Under New York law, the implied covenant "requires that no
party to that contract can do anything which will destroy or injure
the right of another party to receive the benefits of the contract."
Chase Manhattan Bank, 873 F. Supp. at 815.  The plaintiff only argues
that EgyptAir breached provisions of the contract between itself and
the plaintiff, rather than claiming it took any actions to deprive the
plaintiff of the benefits of the contract.

393, 427 (2d Cir. 2004) ("Under New York law, mutual assent is essential to the formation of a contract."). Therefore, to the extent the plaintiff's claim is limited to the parties' bargain, it is not preempted by the ADA. See Levy v. Delta Airlines, No. 02cv477, 2004 WL 2222149, at *4 (S.D.N.Y. Sept. 30, 2004).

## B.

For all other common law claims that may impact airline services, district courts within this circuit apply the three-part test articulated in Justice Sotomayor's decision in Rombom v. United Air Lines, Inc., 867 F. Supp. 214, 221-22 (S.D.N.Y. 1994). See, e.g., Reed v. Delta Airlines, Inc., No. 10cv1053, 2011 WL 1085338, at *4 (S.D.N.Y. Mar. 23, 2011); Farash v. Cont'l Airlines, Inc., 574 F. Supp. 2d 356, 363 (S.D.N.Y. 2008), aff'd, 337 F. App'x 7 (2d Cir. 2009). Under the Rombom test, courts determine (1) whether the activity is a service; (2) "whether the claim affects the airline service directly or tenuously, remotely, or peripherally"; and (3) "whether the underlying tortious conduct was reasonably necessary to the provision of the service." Lozada v. Delta Airlines, Inc., No. 13cv7388, 2014 WL 2738529, at *3-4 (S.D.N.Y. June 17, 2014).[4]

---

[4]     Rombom was decided before the Supreme Court addressed the ADA's effect on state common law claims in Ginsberg and Wolens. It is unclear if Ginsberg should apply to common law claims more generally, and if it does, if it diverges from the Rombom test. Courts in this circuit have continued to apply Rombom to state common law claims

Under the first prong of the Rombom test, "the determination of service rests heavily on the extent to which the activity in question is ordinary and relates directly to air travel." Weiss v. El A. Isr. Airlines, Ltd., 471 F. Supp. 2d 356, 361 (S.D.N.Y. 2006). Although the Second Circuit Court of Appeals has not defined the term "service," it has noted that the majority of appellate courts have defined "service" broadly, as "the provision or anticipated provision of labor from the airline to its passengers and encompasses matters such as boarding procedures, baggage handling, and food and drink-matters incidental to and distinct from the actual transportation of passengers." Air Transp. Ass'n of Am., Inc. v. Cuomo, 520 F.3d 218, 223 (2d Cir. 2008) (holding that "requiring airlines to provide food, water, electricity, and restrooms to passengers during lengthy ground delays" relates to

---

after Wolens.  See, e.g., Lozada, 2014 WL 2738529, at *3-4; Farash, 574 F. Supp. 2d at 363.  Only one court has cited Ginsberg, and that was in the context of a breach of contract claim.  See Gen. Ref. Corp. v. Fed. Ex. Corp., No. 11cv2778, 2014 WL 3734534, at *2 (E.D.N.Y. July 28, 2014).  Ginsberg and Wolens can be read to apply only to claims sounding in breach of contract.  Both cases only pertained to frequent flyer programs and their holdings were limited to whether the claims were based in the parties' agreements or sought to "enlarge the contractual obligations." Ginsberg, 134 S. Ct. at 1426.  Accordingly, the Rombom test should continue to be applied to other common law claims.

Indeed, the parties in this case agreed at oral argument that the Court should apply the Rombom test to the plaintiff's other common law claims.

a "service" within the ADA preemption provision); see, e.g.,
Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1256-57 (11th
Cir. 2003); Hodges v. Delta Airlines, Inc., 44 F.3d 334, 336
(5th Cir. 1995).  All of the plaintiff's claims relate to
EgyptAir's actions and procedures for handling and inspecting
the special items in his checked luggage; more generally, their
baggage handling procedures.  Baggage handling "is clearly
ordinary and relates directly to air travel, as it is usual for
passengers to bring luggage with them when traveling and it is a
customary practice for airlines to check that luggage."  Bary v.
Delta Airlines, Inc., No. 02cv5202, 2009 WL 3260499, at *11
(E.D.N.Y. Oct. 9, 2009), aff'd, 553 F. App'x 51 (2d Cir. 2014).

     As to the second prong, the plaintiff's claims are aimed
directly at the defendants' procedures for handling his checked
luggage, and thus bear a direct relationship to the airline's
service.  The plaintiff argues that his claims would not have
the "forbidden significant effect" on EgyptAir's services
because, as the defendants concede, it is not often that a
passenger inquires about bringing weapon-like items on board.
See Morales, 504 U.S. at 388 (holding that state advertising
restrictions were preempted because they had a "forbidden
significant effect" on fares).  But the plaintiff insists that
EgyptAir take responsibility for how Egyptian authorities would

receive items in the plaintiff's luggage and warn the plantiff

about the alleged requirements of Egyptian law.  The record in

this case demonstrates that EgyptAir does not offer those

services.  Because the plaintiff's claims would require the

defendants to adopt "heightened and qualitatively different

procedures" for baggage handling, the effect of the claims would

not be "tenuous, remote or peripheral."  Bower v. Egyptair

Airlines Co., 731 F.3d 85, 96 (1st Cir. 2013), cert. denied sub

nom. Bower v. EgyptAir Airlines, 134 S. Ct. 1788 (2014).  As the

Court of Appeals for the First Circuit explained, "the ADA

preempts laws regulating the operations of airlines whether at

high cost or low."  Id.

Finally, the third prong of the Rombom test inquires

whether the airline's actions were "'reasonably necessary' to

the provision of the service" and were not "outrageous or

unreasonable."  Lozada, 2014 WL 2738529, at *4 (quoting Rombom,

867 F. Supp. at 222-23).  In cases in which plaintiffs have

demonstrated intentional malicious or unreasonable conduct,

their claims have been found not to be preempted either because

they are not sufficiently related to the airline's services, or

because they fail the third prong and are not reasonably

necessary to the provision of the service.  For example, in

Rombom, Justice Sotomayor found some of the plaintiff's claims

32

were not preempted because the "flight crew's decision to have
[the plaintiff] arrested was allegedly motivated by spite or
some unlawful purpose," and there was a disputed issue of fact
as to whether the airline ordered the arrest.  867 F. Supp. at
224; see also Pittman v. Grayson, 869 F. Supp. 1065, 1074
(S.D.N.Y. 1994) (holding that intentional torts were not
preempted because "the ADA is not intended to be a safe harbor
for airlines from civil prosecution for the civil analogues of
criminal offenses").

On the other hand, in cases where the underlying
allegations or facts reveal that the defendants were only
carrying out their services, even if in a "rude, indifferent,
and uncaring" manner, courts have found that those claims are
still related to the airline services.  Weiss, 471 F. Supp. 2d
at 362; see also Farash, 574 F. Supp. 2d at 366; Khan ex rel.
Haque v. Am. Airlines, Inc., No. 08cv5246, 2008 WL 5110852, at
*4 (S.D.N.Y. Nov. 26, 2008).  The record in this case indicates
that the plaintiff's claims fall into the latter category.
Despite the plaintiff labeling some of his claims intentional
torts, the conduct underlying those claims is not malicious or
outrageous.  Indeed, the plaintiff has not demonstrated that the
defendants did anything but follow their own baggage handling
procedures.  See Reed, 2011 WL 1085338, at *4.

33

All of the plaintiff's common law claims, except for his breach of contract claim, are preempted by the ADA. Accordingly, the defendants' motion for summary judgment dismissing the Complaint is **granted** as to all claims except Count One, which alleges breach of contract.

## V.

In any event, all of the plaintiff's state law claims, whether preempted or not, are without merit.[5]

## A.

The plaintiff claims that EgyptAir breached its contract with him by failing to follow the procedures in the Conditions of Carriage and in various manuals.  The plaintiff claims that these procedures required EgyptAir either to refuse to carry his special items or to provide accurate information about Egyptian laws.

The elements of a breach of contract claim under New York law are "(1) the existence of a contract between [the plaintiff] and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that

---

[5]    The parties' briefs assume that New York law applies for all of the claims, and "such implied consent . . . is sufficient to establish choice of law. <u>Krumme v. WestPoint Stevens Inc.</u>, 238 F.3d 133, 138 (2d Cir. 2000).

34

defendant's breach." <u>Diesel Props S.r.l. v. Greystone Bus.</u>
<u>Credit II LLC</u>, 631 F.3d 42, 52 (2d Cir. 2011).  The parties
agree that the plaintiff entered into a contract with EgyptAir
by purchasing his flight ticket, and the parties agree that the
Conditions of Carriage are incorporated into that contract.  The
parties dispute whether EgyptAir breached that contract in any
way.

The plaintiff argues that EgyptAir breached several
provisions of the Conditions of Carriage.  First, the plaintiff
points to Section 7.1.  But this section only provides that
EgyptAir has a "right to refuse" certain items.  It does not
create a duty to refuse those items.  The plaintiff also points
to provisions within Section 8.3, which is titled "Items
Unacceptable as Baggage."  The plaintiff argues that EgyptAir
breached these provisions when it allowed him to carry the
special items in his luggage.  One subsection the plaintiff
points to begins: "You must not include in your Baggage:" and
then lists several items, such as "[i]tems the carriage of which
is prohibited by the applicable laws, regulations or orders of
any state to be flown from, or to."  Conditions of Carriage, at
8.3.1.

Another provision states that "[f]irearms and ammunition
other than for hunting and sporting purposes are prohibited from

carriage as Baggage." Id. at 8.3.3.  But a following subsection
provides: "If, despite being prohibited, any items referred to
in [this subsection] are included in your Baggage, we shall not
be responsible for any loss or damage to such items." Id. at
8.3.6.  As an initial matter, it is unclear whether the
plaintiff's sound revolvers are "firearms" and whether any of
the items were actually prohibited by Egyptian law, and thus the
plaintiff's proffered subsections may not have applied to any of
the special items.  In any event, the unambiguous intent of this
section is clearly to put the onus on the passengers not to
bring any prohibited items in their baggage.  See Cont'l Ins.
Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010)
("Whether the contract is unambiguous is a question of law for
the court.").  The Conditions of Carriage do not create a duty
on EgyptAir's part to refuse such items or to advise the
passenger about all foreign laws that could prohibit those
items.

    The plaintiff also points to provisions of several internal
EgyptAir manuals which EgyptAir purportedly did not follow.  At
the outset, the plaintiff has not presented any evidence that
any of EgyptAir's internal manuals were incorporated into the
contract between the plaintiff and EgyptAir.  The manuals are
"heavily informational," Maas v. Cornell Univ., 721 N.E.2d 966,

970 (N.Y. 1999); see, e.g., Bierman Decl. Ex. F ("Dangerous Goods" manual); and "do[] not express or support the implication of any promise" made by EgyptAir to the plaintiff.  Maas, 721 N.E.2d at 970 (rejecting university employee's breach of contract claim based on the university's failure to follow its own procedures).  In any event, the plaintiff again only points to manuals that mention weapons that either EgyptAir or other regulations prohibit.  The plaintiff has not shown how these prohibitions create a contractual duty on EgyptAir's part. Moreover, the Conditions of Carriage provide EgyptAir discretion in deciding whether to refuse to carry weapons, and state that the Conditions of Carriage take precedence over any regulation that is inconsistent with them.  Conditions of Carriage, at 2.5.

Because the plaintiff has not identified any breach of contract by the defendants, the defendants' motion for summary judgment dismissing Count One of the Complaint is **granted.**

### B.

The elements of a negligence claim under New York law are: "(1) a duty owed to the plaintiff by the defendant; (2) breach of that duty; and (3) injury substantially caused by that breach."  Lombard v. Booz–Allen & Hamilton, Inc., 280 F.3d 209, 215 (2d Cir. 2002) (citing Merino v. N.Y.C. Transit Auth., 639 N.Y.S.2d 784, 787 (App. Div. 1996)).  The plaintiff claims that

EgyptAir had a duty to protect the plaintiff from foreseeable harm, which the plaintiff contends included his arrest in Egypt arising from his carriage of the special items.  The plaintiff claims that EgyptAir breached that duty by failing to follow its own procedures, and that the plaintiff was arrested and detained as a result of that failure.  The plaintiff's claims are without merit.

"A common carrier such as an airline generally owes its passengers a duty of reasonable care under the circumstances." Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998).  "This duty requires the common carrier to exercise care 'which a reasonably prudent carrier of passengers would exercise under the same circumstances, in keeping with the dangers and risks known to the carrier or which it should reasonably have anticipated.'" Id. (quoting Lesser v. Manhattan & Bronx Surface Transit Operating Auth., 556 N.Y.S.2d 274, 276 (App. Div. 1991)).  For example, airlines have a duty to maintain the safety of the areas within their control, such as baggage retrieval and taxi loading areas.  See Stagl v. Delta Airlines, Inc., 52 F.3d 463, 467 (2d Cir. 1995); Forrester v. Port Auth. of N.Y. & N.J., 527 N.Y.S.2d 224, 226 (1988).

The plaintiff has cited no law or case to support the proposition that EgyptAir "owes a duty to inform its passengers

of the customs and immigration laws of the countries to which it flies." Edem v. Ethiopian Airlines Enter., No. 08cv2597, 2009 WL 4639393, at *7 (E.D.N.Y. Sept. 30, 2009) (rejecting negligence claim against airline based on the plaintiff's detention in foreign country), aff'd, 501 F. App'x 99 (2d Cir. 2012).   Indeed, EgyptAir's Conditions of Carriage specifically advise the passenger that they "are responsible . . . for complying with all laws, regulations, orders, demands and travel requirements of countries to be flown from, into or through which you transit."  Conditions of Carriage, at 13.1.

      The plaintiff argues that once he informed EgyptAir about his special items, EgyptAir had a duty to inform the plaintiff of the problems these items could cause and to take the necessary procedures.  The plaintiff relies on Hunter v. Deutsche Lufthansa AG, 863 F. Supp. 2d 190 (E.D.N.Y. 2012), a case with facts that are surprisingly similar to the unusual facts at hand, but different in key respects.  In Hunter, the plaintiff alleged that he informed the airline personnel that he had a firearm in his checked luggage, that they told him it would be "no problem," and that he was consequently arrested and detained in Dubai.  Id. at 197.[6]  The district court held that

_____

[6]     Unlike the plaintiff in this case, the plaintiff in Hunter alleged that he was imprisoned for 37 days in unsanitary and crowded conditions, and subjected to torture.

the plaintiff stated a claim for negligence because he alleged that one representative of the defendant "affirmatively misinformed" him, and that another representative "did nothing to suggest the baggage would pose any problems."  Id. at 209.

There is no admissible evidence upon which a rational jury could conclude that EgyptAir acted unreasonably in dealing with the plaintiff's special items.  "Normally, in New York, breach is determined by the jury."  Di Benedetto v. Pan Am World Serv., Inc., 359 F.3d 627, 630 (2d Cir. 2004).  "But, of course, 'only in those cases where there arises a real question as to a defendant's negligence should the jury be permitted to proceed." Id. (quoting Basso v. Miller, 352 N.E.2d 868 (N.Y. 1976) (brackets omitted)).  "No such 'real question' has been raised here."  Id.

Unlike in Hunter, which was at the motion to dismiss stage, there is no evidence here that EgyptAir ever misinformed the plaintiff.  The evidence in the record, including the affidavits of the plaintiff's assistants that the plaintiff proffers, indicates that EgyptAir referred the plaintiff to the TSA when asked about the necessary procedures, and did not make any affirmative representations to the plaintiff about Egyptian law. See Bierman Decl. Exs. EE, FF.  At the airport, EgyptAir security officers brought the plaintiff and his special items to

40

the TSA for inspection, and informed EgyptAir personnel in Egypt that the plaintiff was carrying weapons. In Egypt, Egyptian personnsel accompanied the plaintiff and his luggage to Egyptian customs officials, who then searched his luggage. The decision to arrest the plaintiff was made by Egyptian government officials. The plaintiff maintains that the decision itself was contrary to Egyptian law because he did not violate Egyptian law by bringing the special items into Egypt.

The plaintiff argues that EgyptAir breached its duty of reasonable care by failing to follow its own procedures, such as by not giving him a declaration form, and failing to properly train its employees properly. But the plaintiff has offered no admissible evidence to show that EgyptAir should have given him a declaration form, or that the lack of a declaration form led to his arrest. For the former proposition, the plaintiff points to an EgyptAir form concerning the "Declaration of Surrender of Firearms" which is plainly dated 2012, and thus was not in effect at the time of his flight. Bierman Decl. Ex. C, at EA 2009. Moreover, the plaintiff has offered no evidence to dispute the testimony of EgyptAir personnel that EgyptAir only follows TSA regulations in the United States, and thus the manual from which that form is taken does not apply.

41

In support of the link between the lack of a form and the plaintiff's arrest, the plaintiff only relays the statement of an unidentified Egyptian police officer that the plaintiff "would have avoided all problems with the special items" if he had a declaration form from EgyptAir.  Abdel-Karim Decl. ¶ 12. A party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial." Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985) (internal citations omitted).  Thus, even assuming such a form existed, there is no admissible evidence connecting its absence to the plaintiff's arrest.

The plaintiff also points to the report written by an EgyptAir security officer in Cairo, concluding that the New York security personnel failed to follow the correct procedure.  But in his deposition testimony, that officer made clear that the report was based largely on assertions made by the plaintiff, and that he did not consult with anyone in New York as to what happened.  Ahmed Dep. 55, 60-61.  Even accepting the disputed translation of the report and accepting its tentative conclusion that procedures were not followed, it still does not provide a link between the failure to follow procedure and the plaintiff's arrest and detention.  The report relays the plaintiff's

42

assertion that he did not receive the proper form.  Bierman
Decl. Ex. R.  But the only admissible evidence indicates that
the plaintiff was arrested for the possession of the special
items.  See Carlsen Decl. Ex. D.  There is no evidence that the
lack of a form had anything to do with the plaintiff's arrest,
and the charges against the plaintiff were later dismissed.

     Because the plaintiff has not demonstrated any negligent
conduct by EgyptAir employees, no rational jury could find
EgyptAir liable to the plaintiff for a failure to train its
employees.  See Farash, 574 F. Supp. 2d at 368 (dismissing the
plaintiff's claim that the defendant failed to reasonably hire,
supervise, and train a flight attendant because the plaintiff
"failed to allege negligence on the part of the . . . flight
attendant").  And without a viable claim of negligence, the
plaintiff cannot prove gross negligence.  Under New York law, a
plaintiff claiming gross negligence must prove the elements of
negligence, plus that the defendant's conduct "evinces a
reckless disregard for the rights of others or 'smacks' of
intentional wrongdoing."  AT & T v. City of New York, 83 F.3d
549, 556 (2d Cir. 1996); see also Farash, 574 F. Supp. 2d at 368
(dismissing gross negligence claim because plaintiff failed to
state claim for negligence).

Accordingly, the plaintiff has not demonstrated a genuine, material issue of fact as to whether EgyptAir was negligent or grossly negligent.

### C.

The remainder of the plaintiff's claims are without merit for reasons similar to those already discussed.

To establish a breach of fiduciary duty under New York law, the plaintiffs must show "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011). "A fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation. Put differently, a fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." Eurycleia Partners, LP v. Seward & Kissel, LLP, 910 N.E.2d 976, 980 (N.Y. 2009) (internal citation omitted). The plaintiff conceded he was aware of no case where an airline was found to have a fiduciary relationship with a passenger. And indeed, customer relationships are generally not fiduciary relationships. See, e.g., Johnson v. Priceline.com, Inc., 711 F.3d 271, 279 (2d Cir. 2013); Hoffend & Sons, Inc. v. Rose & Kiernan, Inc., 796

44

N.Y.S.2d 790, 791 (App. Div. 2005), aff'd, 851 N.E.2d 1149 (N.Y. 2006).

In arguing that EgyptAir was in a fiduciary relationship with and owed a duty to the plaintiff, the plaintiff argues the same duty as its breach of contract claim—namely, the duty to provide the plaintiff with complete information in response to his inquiries.  But, as explained above, EgyptAir did not have a duty to inform the plaintiff about Egyptian law.  Because the plaintiff has failed to demonstrate the existence of a fiduciary duty, his claim for breach of fiduciary duty is without merit.

To prevail on a claim of negligent misrepresentation,[7] a plaintiff must show: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000); see also Mazzola v.

---

[7]    The Third Count in the plaintiff's Complaint merely states the cause of action as "misrepresentation."  However, the plaintiff's opposition brief makes clear that he is bringing a claim for negligent misrepresentation.

Roomster Corp., 849 F. Supp. 2d 395, 404 (S.D.N.Y. 2012).  The

plaintiff has failed to show that he had a "special

relationship" with EgyptAir.  Moreover, there is no evidence

that EgyptAir provided any false information to the plaintiff.

EgyptAir referred the plaintiff to the TSA when the plaintiff

asked about the proper procedures to follow.  Therefore, the

plaintiff has not shown that EgyptAir made any false

representation.  Accordingly, the plaintiff's claim for

negligent misrepresentation is without merit.

The plaintiff has also failed to establish viable IIED or

NIED claims.  In New York, "[t]he state law tort of intentional

infliction of emotional distress has four elements: (1) extreme

and outrageous conduct, (2) the intent to cause severe emotional

distress, (3) a causal connection between the conduct and the

injury, and (4) severe emotional distress."  Bender v. City of

New York, 78 F.3d 787, 790 (2d Cir. 1996) (citing Howell v. N.Y.

Post Co., 612 N.E.2d 699, 702 (N.Y. 1993)).  Typically, in order

to sustain an IIED claim, conduct must be "so outrageous in

character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community."  Fischer v.

Maloney, 373 N.E.2d 1215, 1217 (N.Y. 1978).  As the Court noted

in the context of its ADA preemption discussion in this opinion,

the plaintiff has not demonstrated any outrageous conduct on the part of EgyptAir.  Accordingly, the plaintiff's IIED claim is without merit.

A New York state appellate court has recently clarified that "extreme and outrageous conduct is not an essential element of a cause of action to recover damages for negligent infliction of emotional distress." Taggart v. Costabile, --- N.Y.S.3d ---, No. 2012-09132, 2015 WL 3875003, at *8 (N.Y. App. Div. June 24, 2015).  There are different types of NIED claims; the plaintiff in this case seeks recovery based on the theory that "when there is a duty owed by defendant to plaintiff, breach of that duty resulting directly in emotional harm is compensable even though no physical injury occurred." Id. at *6.  In addition to the breach of duty, the plaintiff must show that he sustained "mental injury" as a "direct, rather than a consequential, result of the negligence, and that the claim of emotional distress possess[es] some guarantee of genuineness." Id. at *8 (internal citations omitted).[8]  The plaintiff's NIED claim fails

---

[8] The "guarantee of genuineness" requirement has been limited to particular factual situations, such as claims involving "the mishandling of a corpse or the transmission of false information that a parent or child had died." Id.  In the absence of such circumstances, the "guarantee of genuineness generally requires that the breach of the duty to the injured party must have at least endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own physical safety." Id.

47

at the outset in this case because he has not demonstrated any negligent conduct by the defendants.

Finally, the plaintiff has not demonstrated that any genuine, material issues of fact exist as to his claim for false imprisonment.  Under New York law, a false imprisonment claim, which is the same tort as a false arrest claim, requires the plaintiff to show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged."  McKay v. City of New York, 32 F. Supp. 3d 499, 505 (S.D.N.Y. 2014) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).  For a civilian defendant such as EgyptAir to be liable for a false imprisonment claim, it "must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition."  Petrychenko v. Solovey, 952 N.Y.S.2d 575, 578 (App. Div. 2012).

In this case, the record demonstrates that the EgyptAir security officers alerted the Egyptian customs officials of the presence of the special items in the plaintiff's luggage, accompanied the plaintiff to the inspection area, and then left.

48

When the EgyptAir officers left the plaintiff with the Egyptian officials, the plaintiff was only at the inspection stage.  The plaintiff was not placed under arrest until after the Egyptian customs officials searched through his luggage.  Based on these facts, the plaintiff has not demonstrated that the EgyptAir personnel affirmatively induced the Egyptian officials to act or took an active part in the plaintiff's arrest.  See, e.g., Baez v. JetBlue Airways, 745 F. Supp. 2d 214, 224-25 (E.D.N.Y. 2010) (dismissing false arrest claim against airline where security officer only ordered the plaintiff to accompany her to an office with law enforcement officials, while denying motion to dismiss a false arrest claim against gate agent who made a false accusation); Ginsberg v. Am. Airlines, No. 09cv3226, 2010 WL 3958843, at *5 (S.D.N.Y. Sept. 27, 2010) (granting summary judgment for defendant where there was no evidence the defendant made false statements to instigate an arrest).  Accordingly, the plaintiff's claim for false imprisonment is without merit.

### Conclusion

To the extent not specifically addressed above, any remaining arguments are either moot or without merit. For the reasons explained above, the defendants' motion for summary judgment dismissing the plaintiff's complaint in its entirety is **granted. The Clerk is directed to enter judgment and to close this case. The Clerk is also directed to close all pending motions.**

**SO ORDERED.**

Dated:    New York, New York
          July 31, 2015                  _____/s/_____
                                              John G. Koeltl
                                         United States District Judge